IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

UNITED STATES OF AMERICA,           )
                                     )
                    Plaintiff,       )
                                     )
v.                                   )
                                     )          No. 3:18-CR-29-TAV-HBG
LEESHAWN HOWARD, and                 )
JONATHAN JOSUE MACIAS,               )
                                     )
                    Defendants.      )

# REPORT AND RECOMMENDATION

All pretrial motions in this case have been referred to the undersigned pursuant to

28 U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the

District Court as may be appropriate. This case came before the Court on July 26, 2018, for an

evidentiary hearing on the Defendants' Joint Motion to Suppress and Memorandum in Support

Thereof [Doc. 22], filed on May 22, 2018. Assistant United States Attorney Jennifer Kolman

appeared on behalf of the Government. Assistant Federal Defender Bobby E. Hutson, Jr.,

represented Defendant Leeshawn Howard. Attorney Scott L. Sadiak represented Defendant

Jonathan Josue Macias. Both Defendants were also present. At the conclusion of the hearing, the

Defendant Howard requested the opportunity to file a post-hearing brief. The Government filed a

post-hearing brief [Doc. 33] on August 16, 2018. The Defendants filed a joint post-hearing brief

[Doc. 34] on August 20, 2018.[1] The Court then took the matter under advisement.

---

[1] The Defendants requested [Doc. 30] and received [Doc 32] a three-day extension of the
deadline for filing their post-hearing brief.

Based upon the testimony and exhibits presented at the hearing, the arguments of the parties, and the relevant case law, the Court finds that the officer properly stopped the Defendants' car, after observing at least one traffic violation. At that time, the Defendants were not in custody and, thus, the *Miranda* warnings were not required. The Defendants' answers to questions about their travel plans gave the officer reasonable suspicion to continue to investigate. Additionally, law enforcement properly searched the car based upon Defendant Howard's consent. Thus, the Court finds no basis to suppress either the evidence or the statements gained as a result of the traffic stop.

## I.        POSTIONS OF THE PARTIES

This case arises out of the January 15, 2018 stop of the Defendants' Saturn Vue by Tennessee Highway Patrol Trooper William Connors, as the Defendants were traveling eastbound on I-40 through Jefferson County, Tennessee. Based upon evidence seized from their car on that day, Defendants Howard and Macias are charged [Doc. 1] with conspiring to distribute and to possess with intent to distribute fifty (50) grams or more of methamphetamine on January 15, 2018 (Count One). Each Defendant is also alleged to have possessed a firearm in furtherance of a drug trafficking crime on that same day (Counts Two and Three). Finally, Defendant Macias is charged with being a felon in possession of a firearm and ammunition, also on January 15, 2018 (Count Four).

The Defendants ask [Docs. 22 & 34] the Court to suppress all evidence and statements gained from the January 15, 2018 traffic stop, arguing that the trooper's actions violated their rights

under the Fourth and Fifth Amendments to the United States Constitution.[2]  They contend that the video recording from Trooper Connors's patrol car does not reveal that Defendant Howard committed a traffic violation.  Accordingly, they contend that Trooper Connors lacked probable cause to stop their car.  They also argue that Trooper Connors illegally detained them, because the length of the stop exceeded the scope of the alleged traffic stop.  In this regard, the Defendants argue that Trooper Connors lacked reasonable suspicion that they were involved in criminal activity at the time of the stop and that nothing that transpired during the stop gave rise to suspicion of criminal activity.  Finally, they assert that the trooper interrogated them on matters unrelated to the alleged traffic offenses, without providing the *Miranda* warnings and while they were not free to leave the scene of the traffic stop.

The Government responds [Docs. 25 & 33] that Trooper Connors stopped the Defendants, after observing Defendant Howard commit two traffic violations, following another vehicle too closely and failure to maintain his car within the lane.  It contends that these observations gave Trooper Connors probable cause to conduct a traffic stop.  The Government also argues that the traffic stop was reasonable in scope and duration.  It contends that Trooper Connors properly questioned the Defendants to identify them, to complete a records check, and to gather information necessary to compete the traffic stop.  The Government asserts that during this time, the Defendants gave two different stories about their travel itinerary, which, along with the trooper's observations, triggered the trooper's suspicions and permitted him to continue to investigate.  The Government also argues that during this time, Defendant Howard consented to a search of the

---

[2] The Defendants also state that the officers' actions violated their rights under the Sixth Amendment [Doc. 22, p.2].  However, the Defendants do not elaborate on this statement.  Thus, the Court does not address it.

vehicle.  Finally, the Government contends that the Defendants were not entitled to the *Miranda*

warnings because the trooper's roadside questioning did not amount to custodial interrogation.

## II.    SUMMARY OF TESTIMONY

The Government presented the testimony of Trooper William Connors of the Tennessee

Highway Patrol ("THP").  Trooper Connors testified that he has worked for the THP for three and

one-half years and before that, he worked for the Johnson City Police Department for seven and

one-half years [Tr. at 6].[3]    The THP is tasked with stopping criminal activity, including drug

trafficking, on Tennessee highways [Tr. at 6-7].  Trooper Connors has conducted thousands of

traffic stops [Tr. at 8].  He has a video recorder in his patrol car and an audio recorder in this car

and on his person [Tr. at 8].  The camera in his patrol car automatically activates when Trooper

Connors turns on his blue lights and captures the recorded video from thirty seconds prior to him

turning on his lights and audio from the time that his lights are activated [Tr. at 9].

On January 15, 2018, Trooper Connors was on duty between the 409 and 410 mile markers

on the eastbound side of Interstate 40 ("I-40"), which is a three-lane road [Tr. at 8-10].  On that

day, a tractor-trailer traveling in the far right lane attracted his attention, and he activated the patrol

car's camera, planning to pull out onto the road behind the tractor trailer in order to check its

Department of Transportation numbers [Tr. at 9-10].  After the tractor-trailer passed his location,

he saw a green Saturn Vue in the center lane traveling eastbound [Tr. at 10].  Rather than passing

the tractor-trailer, the Vue moved into the far right lane behind the tractor-trailer [Tr. at 11].

Trooper Connors saw the driver of the Vue, who was pushed back in his seat, looking at him "out

---

[3] The transcript [Doc. 29] of the July 26, 2018 evidentiary hearing was filed on August 1, 2018.

of the corner of his eye," as he passed Trooper Connors's location in the median [Tr. at 11]. Trooper Connors testified that as the Vue approached his location, its wheels touched the line dividing the lanes, before it moved into the far right lane [Tr. at 11]. He said that after he entered the roadway, he saw the Vue cross the lane line twice more [Tr. at 11].

Trooper Connors stated that the speed limit on that section of I-40 is fifty-five miles per hour for commercial vehicles and sixty-five miles per hour for passenger vehicles [Tr. at 12]. He said that although the Vue had the opportunity to pass the tractor-trailer, which was moving slower than the Vue, it moved into the far right lane behind it [Tr. at 12]. This change in lanes caused Trooper Connors to think that the driver of the Vue was trying to avoid him, because he had illegal drugs [Tr. at 11-12]. He stated that the driver of the Vue had to apply his brakes repeatedly to keep from getting too close to the tractor-trailer [Tr. at 12]. Trooper Connors testified that vehicles should keep enough distance from other vehicles that three seconds will elapse between the rear of the first vehicle passing a fixed point and the front of the following vehicle passing the same point [Tr. at 13]. He said the Vue was traveling about one second behind the tractor trailer [Tr. at 13]. He said a third vehicle passed the tractor-trailer and the Vue [Tr. at 14]. Trooper Connors reviewed a video recording (Exh.1) from his in-car camera, which he testified shows the Vue crossing over the line dividing lanes twice and riding on top of the right lane marker [Tr. at 16-17]. He identified a photograph of the Vue [Exh. 3] and pointed out that the front passenger tire had much less air than the other tires [Tr. at 19]. Trooper Connors stated that the low air on that tire could have caused the Vue to "pull to one side or the other and cause counter steering," when the vehicle was in operation [Tr. at 19].

Trooper Connors testified that he conducted a traffic stop of the Vue [Tr. at 20]. He stated that at the time he stopped the Vue, he had four or five "indicators" of criminal activity: crossing

over the line dividing lanes, moving into the far right lane behind the tractor-trailer, following the tractor-trailer too closely, and not passing the tractor-trailer, even though it was moving more slowly than other traffic [Tr. at 20]. He said that he started to approach the Vue on the passenger side, which was facing away from traffic, but, when he noticed that the passenger was fully reclined in his seat, he went to the driver's side [Tr. at 20-21]. Trooper Connors said the fact that the passenger remained reclined was another indicator of criminal activity, because most sleeping passengers will sit up when an officer stops the car [Tr. at 21]. Trooper Connors stated that as he approached the driver's side window, he could see the passenger talking to the driver and he noticed the Vue had a North Carolina license plate [Tr. at 21].

Trooper Connors related that he made contact with the driver, whom he later identified as Defendant Howard [Tr. at 22]. He said Howard was breathing heavily and his hands were shaking [Tr. at 22] Trooper Connors asked to see Howard's driver's license, proof of insurance, and registration [Tr. at 22]. When Howard opened the glove box, Trooper Connors saw a black and silver gun inside [Tr. at 22]. He said Howard immediately claimed the gun [Tr. at 22]. During this exchange, the passenger, whom Trooper Connors later identified as Jonathan Macias, was staring straight ahead and not looking at him [Tr. at 22]. Trooper Connors said this was another indicator, as were the gun and Howard's and Macias's facial tattoos [Tr. at 22-23]. Trooper Connors stated that Howard had "NY" tattooed on his left cheek and that Macias had a cross tattooed on his left cheek [Tr. at 23]. He said that facial tattoos are rare and can indicate gang affiliation [Tr. at 23]. Trooper Connors said that he also noted that the car did not contain any luggage [Tr. at 23.]

Trooper Connors testified that Howard gave his driver's license and retrieved the registration from the glove box, after which he shut it [Tr. at 24]. Howard was not able to provide

proof of insurance [Tr. at 24]. Trooper Connors asked Howard to step back to his patrol car and to stand by the wheel on the passenger side [Tr. at 25]. Although it was cold outside that day, Howard declined Trooper Connors's offer for him to sit inside the patrol car [Tr. at 25]. Trooper Connors walked to the passenger side of the Vue, asked Macias to place his hands on the console, and Macias complied [Tr. at 24]. Trooper Connors then removed the gun from the glove box and placed it on the roof of the Vue for safety [Tr. at 24].

Trooper Connors stated that he joined Howard on the passenger side of his patrol car [Tr. at 25-26]. He said that while taking down information on Howard's driver's license and insurance, he asked Howard questions about his itinerary and his passenger [Tr. at 26]. Howard said he was traveling from North Carolina to the mountains in Tennessee, although he could not say where in Tennessee [Tr. at 26-27]. Howard said the total driving time from Raleigh to their vacation destination was eight hours, but he did not know where they had stayed [Tr. at 31-32]. Howard later said they were coming from Nashville [Tr. at 33].

Trooper Connors related that Howard denied being on probation or parole or ever having been arrested [Tr. at 27-28]. Trooper Connors said later in the conversation, Howard told him that he had been arrested for "small crimes," [Tr. at 28]. Howard said that Macias was his cousin [Tr. at 28]. Trooper Connors asked if Macias was an actual cousin or a friend, to which Howard replied that Macias was his friend [Tr. at 28]. Trooper Conners testified that gang members tend to refer to each other as family members [Tr. at 28-29]. Howard said that he was going on vacation to "hang out" with some girls, who were also coming from Raleigh, North Carolina [Tr. at 27, 30]. Trooper Connors asked why the girls did not ride with Howard, who appeared to have room for them in his vehicle, and Howard said they had their own car and wanted to drive themselves [Tr. at 30]. Howard said they were suppose to text their address in the mountains to the girls, who

7

would then meet them, but the girls never showed up [Tr. at 30]. Howard said that instead, he and Macias hung out at the hotel and went to a Waffle House [Tr. at 30].

Trooper Connors said he asked Howard whether he was employed, and Howard replied that he did "odd jobs" but was otherwise unemployed [Tr. at 29]. Trooper Connors said he then asked Howard how he was paying for the trip, if he was unemployed [Tr. at 29]. He said that Howard related that his mother worked two jobs and that she had paid for the trip [Tr. at 29]. Howard also related that he had to support two children from two different mothers [Tr. at 29].

Trooper Connors said that when he first pulled the Vue over, he ran a records check of the license plate [Tr. at 33-34]. He said that about five minutes into the stop, he called for backup, because he thought the Defendants were suspicious [Tr. at 33]. He explained that he also had to have a backup officer present in order to search the car [Tr. at 33].

Trooper Connors stated that he left Howard standing by the patrol car and returned to the passenger side of the Vue to speak with Macias to see if Macias could locate the proof of insurance [Tr. at 34-35]. While Macias was looking through the paperwork in the glove box, Trooper Connors asked Macias about his basic itinerary and the same questions he had asked Howard [Tr. at 35] He asked Macias whether he was on probation or parole, to which Macias replied, "No," [Tr. at 35-36]. Trooper Connors said he later determined this statement was untrue and that Macias had a prior drug conviction [Tr. at 36]. Trooper Connors asked Macias whether he had ever been arrested [Tr. at 36]. Trooper Connors said that Macias first said that he had not been arrested but then said he had been arrested for petty crimes [Tr. at 36].

Trooper Connors said that Macias told him they went to see family but then said that they were coming from the mountains, where they went to meet some girls from Tennessee [Tr. at 36]

Macias said that they met up with the girls two days ago and had "partied all night," [Tr. at 36-37]. Trooper Connors said that Macias also could not give the location of where they had stayed, which the trooper thought was unusual [Tr. at 37]. Trooper Connors stated that Macias was also breathing heavily, looking away from him, and mumbling [Tr. at 37]. He said that Macias seemed nervous and withdrawn, which Trooper Connors found to be another indicator of criminal activity, when considered along with the other indicators in the case [Tr. at 37].

Trooper Connors said that about nine minutes into the stop, he requested a records check on the serial number from the handgun to determine whether it was stolen [Tr. at 38; Exh. 1]. He said he had not received the information on the handgun at the time that Howard consented to a search of the car [Tr. at 38].

Trooper Connors stated that approximately ten minutes after stopping the Vue, he returned to Howard and asked him if there was anything illegal in the car [Tr. at 39; Exh. 1]. He said Howard replied, "Just the gun," [Tr. at 39]. Trooper Connors replied that having a gun is legal and asked if anything else in the car was illegal [Tr. at 39]. Howard said, "No," [Tr. at 39]. Trooper Connors then asked if he could search the car, to which Howard replied, "Yeah, if you want to," [Tr. at 39]. At that point, it was ten minutes from when he first stopped the Vue [Tr. at 39-40]. Trooper Connors was still waiting on back up to arrive at the time Howard gave consent [Tr. at 40]. Trooper Connors contacted HIDTA Watch Center and asked them to run the vehicle and the two driver's license numbers to determine whether Howard and Macias had any prior drug convictions, outstanding warrants, or had recently crossed the border [Tr. at 40]. He stated that HIDTA informed him that Macias had a felony drug conviction [Tr. at 40].

Trooper Connors said that he told Howard that although he had a dog in his patrol car, he could not search the Vue without another officer there [Tr. at 41]. Trooper Connors said, at this point, Howard had already given him consent to search the car, and he was still awaiting the results of the records checks [Tr. at 41]. Trooper Connors testified that he did "other administrative-type stuff while waiting on Trooper Woods to get there," [Tr. at 41]. While still waiting on the results of the records checks, Trooper Connors decided to ask Howard some clarifying questions, after Macias had given a different account of where they had been and who they had met [Tr. 41-42]. In response to these questions, Howard said that he and Macias did not see any girls on their trip [Tr. at 41].

Trooper Connors testified that Trooper Woods arrived at the scene of the traffic stop and pulled in directly behind his patrol car [Tr. at 43]. After Trooper Woods arrived, Trooper Connors received the information from the HIDTA Watch Center [Tr. at 44]. He then had Macias sit in Trooper Woods's patrol car, where it was safer and warm, while the troopers searched the Vue [Tr. at 44]. Howard also accepted Trooper Connors's offer to sit in Trooper Woods's patrol car [Tr. at 44]. Neither Defendant was handcuffed at this time [Tr. at 44]. Trooper Rabun arrived on the scene and deployed his drug detection dog around the Vue [Tr. at 45-46]. At 10:34, the drug detection dog alerted on the Vue [Tr. at 46-47]. The officers seized one kilogram of methamphetamine in two packages, two handguns (one from the glove box and one from the center console), and three cellular telephones from the Vue [Tr. at 48-49; Exh. 4]. They found one package of methamphetamine, which was in a FoodSaver bag, under the front passenger seat and the other package of methamphetamine, which was wrapped like a Christmas gift, under the driver's seat [Tr. at 48-49]. Trooper Connors testified that Macias confirmed that the two packages contained methamphetamine and also told him where the second gun was located [Tr. at 49].

10

Trooper Connors stated that after searching the Vue, he walked to Trooper Woods's patrol car and read the *Miranda* rights to Howard and Macias from a card [Tr. at 49]. He said that both Howard and Macias nodded and said, "Yes," when asked if they understood the *Miranda* warnings [Tr. at 49]. He said that before he read the *Miranda* warnings, Howard and Macias had both denied knowing anything about the drugs in the Vue [Tr. at 50]. Trooper Connors related that about ten minutes after he read the *Miranda* warnings, Macias said the drugs belonged to him [Tr. at 50-51].

On cross-examination,[4] Trooper Connors testified that in performing criminal interdiction, he looks at the driving behavior of the vehicles as they approach him to pick out those vehicles he will look at more closely [Tr. at 52]. He said that if a car creates distance by slowing down and coasting by him, rather than braking to the speed limit or maintaining a steady speed, that behavior that catches his attention [Tr. at 52]. Trooper Connors stated that he had no information from physical surveillance, cellular telephone tracking, or any other source, on Howard or Macias before he saw their car on the interstate [Tr. at 53]. He agreed that all of the information that he had on the Defendants was based upon his observations on that day and what occurred after the stop [Tr. at 53-54]. He said that his patrol car was located in the median perpendicular to the eastbound lanes of traffic [Tr. at 54]. He agreed that someone coming from the west would take this road eastbound to get to North Carolina [Tr. at 54].

Trooper Connors stated that the Vue driven by Howard came over a hill in the center lane and then moved over to the far right lane [Tr. at 56]. He said that he was not using a radar, because he was not looking for speeding violations at that time [Tr. at 56-57]. He said his

---

[4] Mr. Hutson conducted the initial cross-examination of Trooper Connors.

attention was on a tractor-trailer, and he was waiting for traffic to clear before he pulled out onto the interstate, when he noticed Howard's car [Tr. at 57-58]. He estimated that the Vue was going sixty-five miles per hour, when it passed him [Tr. at 66]. He said that as the Vue passed his location, he saw Howard staring at him out of the corner of his eye [Tr. at 58]. He said that he could not tell that there was a passenger in the Vue at that time [Tr. at 66]. Trooper Connors agreed that neither the driver staring at him, nor a passenger sleeping in a reclined position are illegal [Tr. at 58]. He acknowledged that in the narrative section of his report [Exh. 5] on the stop, he stated that the Vue crossed the lane line twice [Tr. at 59]. He said that the Vue crosses the line in the video as well, although it is hard to see [Tr. at 59]. Trooper Connors testified that, although the video recording is good evidence, it "doesn't show everything," [Tr. at 60].

Trooper Connors said that the tractor-trailer that the Vue was following was not the tractor-trailer that he intended to check [Tr. at 60]. He said the tractor-trailer immediately in front of the Vue was traveling below the sixty-five-mile-per-hour speed limit for passenger cars and traveling at the fifty-five-mile-per-hour speed limit for commercial vehicles [Tr. at 61-62]. He stated that this was not worded well in his narrative [Tr. at 61-62]. Trooper Connors agreed he thought it was odd that the Vue did not attempt to pass the tractor-trailer [Tr. at 62]. He said that the Vue could have moved into the center lane to pass the tractor-trailer without impeding his patrol car, because he was in the far left lane [Tr. at 63] He agreed that he entered the interstate just as the tractor trailer and the Vue passed his location [Tr. at 63-64]. Trooper Connors said that he stopped the Vue because Howard violated two Tennessee laws [Tr. at 64]. He agreed that a driver of a vehicle traveling behind a tractor-trailer or another car that is slowing down would naturally apply his or her brakes and slow down also [Tr. at 65].

Trooper Connors stated that Howard stopped quickly when he activated his blue lights and pulled over without incident [Tr. at 68]. He said that he was wearing his uniform that day and carrying his firearm and baton [Tr. at 68]. Trooper Connors said that he could see into the car, including into the trunk, and that he did not see any luggage in the car as he approached [Tr. at 82]. As he walked up to the driver's side of the Vue, Howard opened the door [Tr. at 69]. He said that he grabbed the door, blocking Howard in the driver's seat [Tr. at 69]. Trooper Connors said that Howard was not free to leave at that time [Tr. at 69]. He said he noticed Howard's facial tattoo, which was a red flag, based upon his training and experience [Tr. at 69-70]. Trooper Connors testified that he thought Howard was more nervous than the average person at a traffic stop, because he was breathing heavily and his hands were shaking [Tr. at 87-88]. Trooper Connors acknowledged that it was cold that day but stated that Howard was shaking, when Trooper Connors first approached him inside the Vue [Tr. at 88].

Trooper Connors said when Howard opened the glove compartment, Howard said, I've got a gun right there, it's mine," [Tr. at 70]. Trooper Connors agreed that it is legal for an individual to carry a gun, if they are not a felon [Tr. at 71]. He said he put the gun on the top of the car on the passenger side to keep it away from both Howard and Macias [Tr. at 71-72]. Trooper Connors agreed that he did not see any drugs or drug paraphernalia inside the car [Tr. at 90]. He acknowledged that neither occupant made any dangerous movements toward him [Tr. at 90].

Trooper Connors agreed that he asked the Defendants numerous questions, while waiting to receive information on the records check [Tr. at 74]. He said based upon the indicators that he had up to that point, he knew criminal activity was probably afoot by the time he had Howard step out of his car and stand by the patrol car [Tr. at 75]. He said that point, he knew that "this was something other than a normal traffic stop," [Tr. at 75]. He said that was why he asked questions

[Tr. at 75]. Trooper Connors agreed that at the time Howard stepped out of the Vue, he had not found criminal activity and that he was still investigating [Tr. at 75]. He said that his questions about Howard's employment and how he afforded the trip related to how Howard was getting money and whether his funds were from criminal activity [Tr. at 76]. He said that he asked a lot of questions about the Defendants' itinerary, including questions about girls that the Defendants were meeting, because Howard's and Macias's stories were different [Tr. at 76-77] He agreed that his questions about Howard's employment and the Defendants' itinerary did not relate to the traffic stop [Tr. at 77]. Trooper Connors stated that he could not recall asking the Defendants any questions about the traffic violations [Tr. at 98].

Trooper Connors stated that at the time Howard came to stand by his patrol car, he had "reasonable suspicion" that criminal activity was afoot based upon the Vue moving into the far right lane from the center lane, crossing the lane line, and following too closely; Macias remaining reclined in his seat while awake; there being no luggage in a car from out of state; both occupants breathing heavily and having facial tattoos; and there being a gun in the car [Tr. at 77]. He said once he began questioning Howard, his suspicion increased because Howard did not know where he had stayed while on vacation [Tr. at 78]. He said that Howard said he was returning to Raleigh and that the trip took eight hours, but he did not know where he was coming from [Tr. at 84-85]. Trooper Connors said Howard first said he was coming from Gatlinburg, which did not make sense, when he said he had been driving for three hours [Tr. at 86]. He said he would expect someone from out of state to know the hotel and the city where they had stayed [Tr. at 85].

Trooper Connors said he stopped the Defendants for traffic offenses, and once stopped, the Defendants kept giving him indications that they were doing something illegal and his suspicion kept building [Tr. at 79]. Trooper Connors said he asked Howard for consent to search his car,

14

because by that time he had between ten and twenty indicators of criminal activity [Tr. at 90]. He said that the Defendants answered his questions freely and could have declined to answer questions unrelated to the traffic stop at any time [Tr. at 80]. Trooper Connors said that he did not advise the Defendants of the *Miranda* rights when he questioned them because they were not under arrest [Tr. at 80]. He agreed that they were detained for a traffic violation and were not free to leave [Tr. at 80]. He said that he typically separated people to question them [Tr. at 85].

Trooper Connors testified that the three other troopers who arrived on the scene were in uniform, armed, and in patrol cars with their lights activated [Tr. at 73-74, 81] He said that the other troopers parked behind him in the emergency lane [Tr. at 74]. Trooper Connors said that the drug detection dog had a "change in behavior" on the passenger side of the Vue [Tr. at 92]. Trooper Connors stated that his microphone was on at the time he read the *Miranda* warnings to the Defendants but that it had not synced with the camera in his patrol car in order to record what he was saying [Tr. at 97-98]. He agreed that Howard denied having any knowledge of the drugs in the car and that Macias claimed the drugs, while at the scene [Tr. at 93-94].

On continued cross-examination,[5] Trooper Connors testified that at 10:07:56 on the video recording of the stop, he was in the median of I-40 with his patrol car in drive and his foot on the brake, because he was waiting for traffic to clear to pull onto the interstate [Tr. at 100-101]. He agreed that whether a vehicle is following more closely than is reasonable and prudent depends upon the type of road and the weather [Tr. at 101-102]. After reviewing the video recording, Trooper Connors agreed that at the time the Vue passed his patrol car, it was three seconds behind the tractor-trailer, but he stated that this was not when the traffic violation occurred [Tr. at 103].

_____

[5] Mr. Saidak cross-examined Trooper Connors, after Mr. Hutson had completed his questions.

He said the point when the Vue first begins following the tractor trailer too closely is hard to see in the video but that it was too close when it begins braking [Tr. at 103-104]. He stated that the Vue following too closely was "a lot more clear in person that what this video can show," [Tr. at 104]. Trooper Connors said that the video recording is very pixilated and that it is hard to see when the Vue crosses the lane line on the video [Tr. at 104-105]. He testified that the Vue touched the lane line before it passed his location in the median and then it crossed the lane line twice, after the Vue moved into the far right lane [Tr. at 109]. He acknowledged that the Vue had to completely cross the lane line, rather than touching the lane line, to be a lane departure violation [Tr. at 110].

Trooper Connors said that at the time he activated his blue lights, the Vue was going about fifty-five miles per hour [Tr. at 111]. He agreed that it would be safer for the Vue to travel under the speed limit, rather than over the speed limit, as long as it was not blocking other cars [Tr. at 111-112]. He said that at the time he walked up to Howard on the driver's side of the Vue, Howard was not under arrest but was detained for traffic violations [Tr. at 112]. Trooper Connors stated that he typically tells motorists the reason he stopped them and asks for their license and registration [Tr. at 113]. He said on the recording, he could not hear whether he did that in this case, because of the traffic on the road [Tr. at 113]. He stated that he does not ask motorists, whom he has stopped for a traffic violation, whether they are on probation or parole, when there are no indicators present [Tr. at 114]. He agreed that he stopped the Vue at 10:09:49 on the video [Tr. at 114]. He said he ran a records checks on the vehicle when he stopped it and on the gun "within the initial stop," [Tr. at 115]. He agreed that he referred to Howard as "brother," while talking with him [Tr. at 115]. He said that he requested a records check from the HIDTA Watch Center, after he had asked Howard for consent to search the car [Tr. at 115-116].

16

Trooper Connors stated that after he talked with both Howard and Macias and their stories did not match up, he called for back up [Tr. at 117]. He said that this piece of information was out of chronological order in the narrative in his report [Tr. at 117]. He stated that at the time Macias went through the paperwork in the glovebox, Macias also seemed more nervous than the average person he stopped [Tr. at 117-118]. He agreed that Macias was looking through someone else's car for an insurance card that did not belong to him [Tr. at 118].

Trooper Connors agreed that he removed Macias from the Vue at 10:32 on the video recording, patted him down, and then placed him in Trooper Woods's patrol car [Tr. at 118]. He agreed that within ten minutes of moving Macias to the patrol car, drugs were discovered in the Vue [Tr. at 118]. He then went to the patrol car containing Howard and Macias and advised them of the *Miranda* warnings [Tr. at 118-19]. Trooper Connors agreed that when he gave the *Miranda* warnings, the time on the recording from Trooper Woods's camera is 11:42, but he stated that Trooper Woods's camera was on Eastern Standard Time, rather than Central Time [Tr. at 120].

On redirect examination, Trooper Connors testified that neither Howard, nor Macias, ever told him that they were coming from Charlotte [Tr. at 121]. He agreed that Charlotte is farther east than Raleigh, North Carolina, and is more than eight hours away [Tr. at 121-22]. He stated that the video recording was not the exact view that he had of the vehicles during the incident [Tr. at 122]. He said that he remembered that the Vue crossed over the lane line twice and that it crossed the lane line another time before the recording began [Tr. at 122]. Trooper Connors stated that at 10:09:25 on the video recording and before he activated his blue lights, he was traveling fifty-five miles per hour [Tr. at 123-24]. He said this reveals that Howard was traveling ten miles per hour under the speed limit for passenger vehicles at that time [Tr. at 123]. He agreed that the video recording shows that Howard had to apply his brakes behind the tractor trailer [Tr. at 123].

He said that the times are different on the recordings from his and Trooper Woods's cameras because the two cameras are set to a different time zones [Tr. at 124].

On recross-examination, Trooper Connors said that when he first saw the Vue in the middle lane, before the recording began, it "touched the lane line, crossed the lane line that's in between the far left lane and [him], went back and crossed into the right lane," [Tr. at 125-126]. He said that the view of the Vue in the video recording is not as good as his actual view on that day [Tr. at 126]. Trooper Connors stated that it is "very hard to see the crossing lane lines" on the video recording but that the video recording "plainly shows the following too closely" [Tr. at 126]. He said that it is hard to hear the audio on the recording, when traffic is passing the location of the stop, but he repeats questions in order to compensate for the noise from traffic [Tr. at 126-127]. He agreed that the travel time from Nashville to Raleigh and Nashville to Charlotte is approximately eight hours [Tr. at 127].

### III.    FINDINGS OF FACT

Based upon the testimony of Trooper Connors and the exhibits in this case, the Court makes the following factual findings:

On the morning of January 15, 2018, Trooper William Connors of the Tennessee Highway Patrol was on duty and parked in the median, perpendicular to the eastbound lanes of I-40. While waiting for a break in traffic so that he could enter the roadway, he saw a green Saturn Vue come over a hill in the middle lane. The Vue touched, but did not cross, the line dividing the middle and left lanes, then moved into the right lane, behind a tractor trailer, which was traveling at fifty-five miles per hour. Trooper Connors thought that the Vue's move into the right lane behind the tractor

18

trailer, just after the driver of the Vue could see him, was suspicious and could indicate that the Vue was transporting illegal drugs. The Vue passed Trooper Connors's patrol car as Trooper Connors pulled from the median into the left lane of I-40. At that time, which was 10:08:14 on the video recording, the Vue was traveling at sixty-five miles per hour and was three seconds behind the tractor trailer. As the Vue continued in the right lane, it drew progressively closer to the tractor trailer. Trooper Connors saw the Vue cross the line dividing the lanes twice. Trooper Connors moved into the middle lane at 10:09:00 on the video recording, and the Vue braked six seconds later. Trooper Connors moved into the right lane behind the Vue at 10:09:19 on the video recording. Five seconds later, Trooper Connors activated his blue lights and stopped the Vue for two traffic violations, failure to maintain a lane and traveling too closely to the tractor trailer. The Vue immediately pulled over without incident. Trooper Connors radioed for a check on the Vue's North Carolina license plate.

As Trooper Connors approached the Vue from his patrol car, he noticed that it contained two male occupants and that the passenger was awake and talking to the driver but remained reclined in his seat. He also noticed that the car did not contain luggage. The driver Leeshawn Howard opened the driver's side door just as Trooper Connors walked up. Trooper Connors stood inside the driver's side door, shielded from the passing traffic, and requested a driver's license, registration, and insurance card from Howard. At that time, Trooper Connors noticed that both men had facial tattoos on their left cheeks and that Howard was breathing heavily and his hands were shaking. Trooper Connors stated that Howard was more nervous than the average motorist. Howard gave Trooper Connors his driver's license. When Howard opened the glovebox to get the registration, Trooper Connors saw a gun in the glovebox. Howard immediately told Trooper Connors that the gun was his. While Trooper Connors talked with Howard, the passenger stared

19

forward and did not look at the officer. Howard gave Trooper Connors the car's registration but not the proof of insurance. Trooper Connors asked Howard to step out of the car and back to his patrol car. Trooper Connors then walked to the passenger side of the Vue, asked the passenger to place his hands on the center console, retrieved the gun from the glovebox, and placed it on the roof of the Vue.

Trooper Connors joined Howard at the front passenger side of his patrol car and, while recording information on Howard's driver's license and insurance, Trooper Connors questioned him about his itinerary and his passenger. Howard told Trooper Connors that they had traveled eight hours from Raleigh, North Carolina, to the mountains for vacation and that they were supposed to meet some girls, who were traveling separately from North Carolina. However, Howard said the girls never showed up, and after spending one night, he was returning to North Carolina. Howard did not know the name of the city or the hotel where they had stayed. He told Trooper Connors that his passenger, Jonathan Macias, was his cousin but then agreed that he was actually a friend, rather than a relative. Pursuant to questions by Trooper Connors, Howard stated that he was not on probation or parole, that he had never been arrested, and that he was unemployed.

Trooper Connors returned to the passenger side of the Vue and asked Macias to identify himself. He then asked Macias to look through the papers in the glovebox for proof of insurance. Trooper Connors said Macias also seemed overly nervous and withdrawn. Pursuant to questions from Trooper Connors, Macias said he was not on probation or parole and that he had been arrested for petty crimes. Trooper Connors questioned Macias about his and Howard's itinerary. Macias first said they had gone to visit family and then said they had partied with some girls from Tennessee. Macias also could not identify the town or the hotel where he and Howard had stayed.

Macias was not able to locate the proof of insurance in the glove box. While standing beside the Vue, Trooper Connors radioed in the serial number from the gun and called for back up.

As he awaited the results from the records checks, Trooper Connors returned to talk with Howard and asked him whether the Vue contained anything illegal. Howard responded nothing except for the gun. When Trooper Connors said that it is not illegal to have a gun, Howard said that he did not know of anything illegal in the car. Trooper Connors asked if there were drugs in the car, and Howard denied that any drugs were in the car. Trooper Connors asked Howard if he could search the car, and Howard said he could if he wanted. Trooper Connors asked Howard if he had anything illegal on his person and if he could search Howard. Howard denied having anything illegal but agreed to be frisked. While searching Howard, Trooper Connors questioned Howard again about their trip. Howard confirmed that the two men did not meet up with girls during their travels and stated that they went to Waffle House. Ten minutes had elapsed from the time Trooper Connors stopped the Vue to the time that Howard gave consent to search the car.

Trooper Connors walked back to the Vue and got Macias's drivers license. Trooper Connors then returned to his patrol car, where he radioed Howard and Macias's driver's license numbers to the HIDTA Watch Center to check whether Howard or Macias had a criminal history. While entering information into his in-car computer, Trooper Connors continued questioning Howard about his smoking habits, the lack of luggage in the car, his children, his employment history, and how he afforded the trip. Trooper Connors confirmed that Howard did not know the town in which he had stayed. Howard related that once they arrived at where they were staying, they texted their location to the girls who were to meet them. Pursuant to questions by Trooper Connors, Howard said nothing was hidden in the car.

Trooper Woods arrived twenty minutes after the initial stop, and Trooper Connors briefed him on the situation. Trooper Connors asked Howard to sit in Trooper Woods's patrol car during the search of the Vue. Trooper Connors returned to the Vue, asked Macias to get out, and frisked him. Trooper Connors then directed Macias to sit in Trooper Woods's patrol car. The Watch Center informed Trooper Connors that Macias had a prior felony drug conviction. Trooper Rabun, who arrived on the scene after Trooper Woods, led his drug detection dog around the Vue, and the dog alerted on the front passenger side. The dog sniff occurred approximately twenty-four minutes after the initial stop. Within two minutes of the dog sniff, Troopers Woods and Connors searched the Vue and found two packages of methamphetamine under the driver's and front passenger seats. They also found a second handgun in the center console. After searching the car, Trooper Connors returned to Trooper Woods's patrol car and read the *Miranda* warnings to Howard and Macias from a card. Both men stated that they understood the warnings. About ten minutes after Trooper Connors read the *Miranda* warnings, Macias gave a statement, claiming ownership of the drugs and the gun from the console.

## IV.    ANALYSIS

The Fourth Amendment protects citizens against unreasonable searches or seizures. U.S. Const. amend IV. The Fifth Amendment provides the right not to incriminate oneself. U.S. Const. amend V. Defendants Howard and Macias argue that their rights under the Fourth Amendment were violated (1) because Trooper Connors lacked probable cause to stop them for a traffic violation on January 15, 2018, and (2) that Trooper Connors unlawfully detained them beyond the time necessary to issue citations for traffic violations. They also contend (3) that Trooper Connors

violated their Fifth Amendment protection against self-incrimination by questioning them without advising them of the *Miranda* warnings. The Court examines each of these issues in turn.

### A. Probable Cause for Traffic Stop

Defendants Howard and Macias argue that Trooper Connors lacked probable cause to stop them on January 15, 2018, because no traffic violation had occurred. They maintain that the video recording from Trooper Connors's patrol car shows that their car did not cross the line dividing the lanes at any time. Although they state that they do not challenge Trooper Connors's credibility [Doc. 34, p.9], they contend that the video is more reliable evidence than Trooper Connors's recollection of an event that occurred some eight months earlier. They also assert that the Vue slowed down after the tractor trailer reduced its speed and Trooper Connors entered the roadway. The Defendants maintain that it was reasonable and prudent for Defendant Howard to choose not to pass the tractor trailer, because Trooper Connors had entered the road and was accelerating. They argue that slowing down behind the tractor trailer was the safest course for Defendant Howard at that point. Because the Vue was stopped without probable cause, the Defendants ask the Court to suppress all evidence that flowed from the traffic stop.

If an "officer has probable cause to believe that a traffic violation has occurred or was occurring, the resulting stop is not unlawful and does not violate the Fourth Amendment." *United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir. 1993), *cert. denied*, 513 U.S. 828 (1994). Whether a traffic stop is an unreasonable seizure in violation of the Fourth Amendment is assessed, like other alleged Fourth Amendment violations, by objectively evaluating the officer's conduct in light of the surrounding circumstances known to the officer. *Id.* at 388; *see Whren v. United States*,

23

517 U.S. 806, 810 (1996) (holding that "[a]s a general matter, the decision to stop an automobile is reasonable [within the meaning of the Fourth Amendment] where the police have probable cause to believe that a traffic violation has occurred"); *United States v. Townsend*, 305 F.3d 537, 541 (6th Cir. 2002) (holding that "[a] police officer may effect a traffic stop of any motorist for any traffic infraction, even if the officer's true motive is to detect more extensive criminal conduct"). Probable cause is "reasonable grounds for belief supported by less than prima facie proof but more than mere suspicion," *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990). In other words, probable cause means a substantial chance or likelihood of criminal conduct. *Ferguson*, 8 F.3d at 392 (citing *Illinois v. Gates*, 462 U.S. 213, 244 n.13 (1983)).

The Court finds that Trooper Connors lawfully stopped the Saturn Vue driven by Defendant Howard. Based upon his personal observations, Trooper Connors had probable cause to believe that the driver of the Vue had committed two traffic violations: (1) failure to maintain a single lane as nearly as practical in violation of Tenn. Code Ann. § 55-8-123(1), and (2) following too closely in violation of Tenn. Code Ann. § 55-8-124(a).

Tennessee law provides that whenever a road has been divided into two or more lanes, a "vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from that lane until the driver has first ascertained that the movement can be made with safety[.]" Tenn. Code Ann. § 55-8-123(1). In the instant case, Trooper Connors testified that he observed the Vue cross the line dividing the lanes twice, after he activated his camera.[6] During a review of

---

[6] The Government contends that Trooper Connors also testified that the Vue crossed the line dividing the lanes once before he activated his camera. The Court finds that Trooper Connors testified both that the Vue crossed the line dividing lanes and that it only touched but did not cross the lane line. The Court finds that the Vue only touched, but did not cross, the lane line when Trooper Connors first saw it traveling eastbound on I-40. Trooper Connors' testimony that the

24

the video recording from his in-car camera, he stated that he could not pick out when the car crossed the lane line, because the image was pixelated.  He also testified that he had a better view of the Defendants' car at the time, than the video depicts.

The Defendants argue that the video recording [Exh. 1] from Trooper Connor's patrol car contradicts Trooper Connors's testimony that the Vue twice crossed the line dividing the lanes. They contend that the video recording does not show that the Vue failed to maintain its lane.  The Court has reviewed the video recording and finds that, due to the distance and the angle of the camera, the Court cannot discern the Vue crossing the lane line, during the first forty-two seconds after Trooper Connors pulls into the left lane of I-40.  However, as Trooper Connors gets closer to the Vue, it appears that the Vue crosses over the line dividing the right lane from the emergency lane at 10:08:56-57 in the video recording.

Our appellate Court has held that a single instance of crossing the lane line does not amount to a violation of § 55-8-123(1).  *United States v. Freeman*, 209 F.3d 464, 466 (6th Cir. 2000).  In this case, the Court finds, based upon Trooper Connors's testimony, that the Vue crossed outside of the right lane twice.  Although the Defendants argue that the video recording contradicts Trooper Connors's testimony, the Court finds that Trooper Connors's personal view of the Defendants' car on January 15, 2018, was better than the view depicted in the video recording.  Trooper Connors testified that he could see more clearly that day, than the video recording reveals.  Additionally, Trooper Connors's narrative from his report [Exh. 5], completed close in time to the January 15, 2018 traffic stop, corroborates his testimony that the Vue crossed the lane line twice.  Accordingly, the Court credits Trooper Connors's testimony that the Vue crossed over the lane line twice, after

---

Vue improperly crossed the lane line twice (rather than three times) is corroborated by his report [Exh. 5].

the video recording began.  *See United States v. Fisher*, 27 F. App'x 558, 560 (6th Cir. 2001) (holding that where there are two permissible views of the testimony at issue, the court is entitled to choose between them, so long as the choice is not "clearly erroneous").

With regard to the traffic offense of following too closely, Tennessee law provides that "[t]he driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of the vehicles and the traffic upon and the condition of the highway."  Tenn. Code Ann. § 55-8-124(a).  The statute offers the following guidance as to what constitutes following too closely, at least with regard to vehicles traveling in a caravan:

> Motor vehicles being driven upon any roadway outside of a business or residence district in a caravan or motorcade, whether or not towing other vehicles, shall be so operated as to allow sufficient space between each vehicle or combination of vehicles so as to enable any other vehicle to enter and occupy the space without danger.  This subsection (c) does not apply to funeral possessions.

Tenn. Code Ann. § 55-8-124(c).

In this case, Trooper Connors testified that he observed the Vue, which was traveling at sixty-five miles per hour, pull into the right lane behind a tractor trailer, which was traveling at fifty-five miles per hour.  Trooper Connors stated that under normal weather and traffic conditions, he deemed a distance between vehicles that would allow three seconds to elapse between the first vehicle and the second passing a fixed point to be safe.  He said that although the Vue was three seconds behind the tractor trailer at the time the Vue passed his location in the median, it progressively gained on the tractor trailer, until it was traveling only one second behind it.  Trooper Connors also testified that he deemed the distance between the Vue and the tractor trailer to be too close and that at one point the driver of the Vue had to apply his brakes in order to avoid the tractor trailer.  The Court finds that the video recording [Exh. 1] from Trooper Connors's patrol car

corroborates his testimony. Accordingly, the Court finds that Trooper Connors had probable cause to believe that Defendant Howard was following the tractor trailer too closely in violation of § 55-8-124(a).

Based on the analysis above, the Court disagrees with the Defendants' assertion that Trooper Connors was merely engaged in a "fishing expedition" [Doc. 34, pp. 14, 24], when no traffic infraction had actually occurred. As discussed above, the Court finds that Trooper Connors's probable cause for stopping Defendant Howard for traffic offenses was objectively grounded in both fact and law. Thus, Trooper Connors's decision to stop the Vue was not an abuse of his authority. *See Freeman*, 209 F.3d at 470-71 (Clay, J., concurring) (observing that in permitting officers broad latitude to stop for any infraction even though the officer's real purpose is to find evidence of another crime, the court has a duty to insure that an officer is not abusing his or her authority). Unlike the officer in *Freeman*, who erroneously stopped the defendant for failing to keep his motor home within a single lane as nearly as practicable based upon the motor home crossing into the emergency lane for a few feet on a single occasion, *id.* at 466, the Court finds that Trooper Connors observed two traffic violations, while following the Defendants for over one minute.

Because Trooper Connors had probable cause to stop the Vue for the traffic violations that he observed occur, the Court finds that the Defendants were properly seized under the Fourth Amendment. The stop itself provides no basis for the suppression of evidence.

### B. Scope and Duration of Traffic Stop

The Defendants argue that the scope and duration of the stop exceeded the time necessary to issue traffic citations and that Trooper Connors lacked reasonable suspicion to extend the stop. They contend that Trooper Connors unreasonably extended the detention by asking them numerous intrusive questions, unrelated to the traffic stop. They maintain that their answers to Trooper Connors's questions were consistent with them being visitors from another state who are unfamiliar with their location. Moreover, they assert that neither their answers to the trooper's questions, nor other benign facts surrounding the stop, such as the fact that they had facial tattoos or Howard referring to Macias as "cousin," raised any suspicion of criminal activity. Accordingly, they argue that Trooper Connors had no reason, much less reasonable suspicion, to believe that criminal activity was afoot at the time he asked Defendant Howard for consent to search the Vue.

"[A] search which is reasonable at its inception may violate the Fourth Amendment by virtue of its intolerable intensity and scope." *Terry v. Ohio*, 392 U.S. 1, 18 (1968). Once a court determines that a seizure was proper, it must still assess "whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* at 20. A traffic stop that is "based on probable cause and concededly lawful" can nevertheless "violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). "Once the purpose of the traffic stop is completed, a motorist cannot be further detained unless something that occurred during the stop caused the officer to have a reasonable, articulable suspicion that criminal activity was afoot." *United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999), *cert. denied,* 528 U.S. 1176 (2000).

There is no set length of time after which a traffic stop becomes per se unreasonable. *United States v. Everett*, 601 F.3d 484, 493 (6th Cir. 2010). In addition to issuing a citation, actions such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance" are all typical inquiries incident to a traffic stop. *Rodriguez v. United States*, 135 S. Ct. 1609, 1615 (2015). "If an officer has a reasonable and articulable suspicion of criminal activity, he may extend the traffic stop long enough to confirm or dispel his suspicions." *United States v. Johnson*, 482 F. App'x 137, 143 (6th Cir. 2012). When evaluating whether a crime is afoot, law enforcement officers may draw upon their training and experience "to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *United States v. Shank*, 543 F.3d 309, 315 (6th Cir. 2008) (internal quotation omitted).

"In assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *United States v. Sharpe*, 470 U.S. 675, 687 (1985) (assessing the reasonableness of a *Terry* stop). "[C]ontext-framing questions," such as travel history and plans, "will rarely suggest a lack of diligence." *Everett*, 601 F.3d at 495. Also, questions relating to officer safety are appropriate. *Id.* Some amount of questioning unrelated to the traffic stop is permitted, so long as "the officer's overall course of action during a traffic stop, viewed objectively and in its totality, is reasonably directed toward the proper ends of the stop." *Id.*; *United States v. Kenneth Kevin Cochrane*, No. 11-4081 & -4082, 2012 WL 6621131, *3 (6th Cir. Dec. 20, 2012) (holding that officers may ask unrelated, "extraneous questions" during a traffic stop, if the questions do not prolong the stop). However, if the totality of the circumstances reveals that the

officer, without reasonable suspicion, abandoned pursuit of the traffic stop to investigate another crime, then the officer did not act with the diligence required by the Fourth Amendment. *Everett*, 601 F.3d at 495.

In the instant case, the Court finds that Trooper Connors's suspicions of criminal activity were first aroused even before he observed the traffic violations, when he saw the Vue come over a hill in the middle lane and promptly move into the right lane behind a slower-moving tractor trailer, once Trooper Connors's patrol car came into view. Trooper Connors, who has over ten years of experience in law enforcement, testified that this abrupt lane change caused him to think that the driver was trying to avoid his attention, because he had illegal drugs. Trooper Connors also testified that he thought it unusual that the Vue remained behind the tractor trailer, which was going ten miles per hour slower than the Vue, rather than passing the truck in the middle lane, as another car did.

Once he stopped and approached the Vue, Trooper Connors noticed additional circumstances that he characterized as indicators of criminal activity: Although the Vue had a North Carolina license plate, it contained no luggage. The passenger remained reclined in a sleeping position, even though he was awake and talking to the driver as Trooper Connors approached. The driver, Defendant Howard, was extremely nervous—more nervous than the average motorist in a traffic stop—was breathing heavily, and his hands were shaking as he handed Trooper Connors his driver's license. Both Defendants had facial tattoos on the left cheek, which Trooper Connors said was rare for the motoring public but common to gang members. When Defendant Howard opened the glove box to get his registration, Trooper Connors saw a gun, which Howard immediately claimed as his. The passenger, Defendant Macias, did not look at Trooper Connors during this entire encounter but, instead stared straight ahead. Trooper Connors made

30

these observations within the first minute of the traffic stop and while he gathered Defendant Howard's driver's license and registration.

After securing the gun on top of the Vue, Trooper Connors joined Defendant Howard beside his patrol car and began taking down information on Howard's driver's license and insurance. At this time, Trooper Connors was still conducting the traffic stop. While filling out this information, Trooper Connors questioned Howard about his itinerary and his passenger. During this brief conversation, Trooper Connors learned three pieces of information that bolstered his suspicion: Howard said he had driven eight hours from North Carolina to Tennessee for vacation but did not know the name of the city or hotel where he had stayed. Howard referred to Macias as "cousin," although they were not related, which Trooper Connors said was characteristic of gang members. Also, Howard was unemployed and, yet, on vacation in another state.

After talking with Howard, Trooper Connors returned to the Vue and asked Macias to look through the paperwork in the glovebox for the proof of insurance, which Trooper Connors needed to complete the traffic stop. While Macias looked through the papers in the glovebox, Trooper Connors asked him about his and Howard's trip. His brief conversation with Macias also bolstered Trooper Connors' suspicion that the Defendants had illegal drugs: Trooper Connors characterized Macias as overly nervous. Macias's description of their trip differed substantially from Howard's. Additionally, Macias also could not identify either the town or the hotel where he and Howard had stayed.

The Court finds that at this point, approximately nine minutes after stopping the Vue and before he had completed the traffic stop, Trooper Connors had reasonable and articulable suspicion that Howard and Macias had illegal drugs in the car. In addition to the weaker indicators of

31

nervousness, the lack of luggage, Macias not sitting up or looking at the trooper, and potential gang affiliation, the Defendants claimed to have driven eight hours to take a one-day vacation at a town and hotel that they could not name. Moreover, the dramatic differences in their accounts— Howard saying that they did not meet up with the girls from North Carolina, Macias claiming they met a bunch of girls from Tennessee and partied all night—could indicate that they were attempting to cover up a trip to obtain drugs. *See Hill*, 195 F.3d at 272 (finding that inconsistencies in travel plans between the occupants of a vehicle supported reasonable suspicion). Finally, based upon Trooper Connors's training and experience, Howard's initial driving behavior caused Trooper Connors to believe Howard was trying to avoid the trooper's notice, because he was transporting illegal drugs. These factors, considered together, constitute specific and articulable facts supporting an inference that the Defendants were engaged in criminal activity, namely possession of illegal drugs.

At this point, after questioning the two men separately, Trooper Connors acted quickly to either confirm or dispel his suspicions of criminal activity by calling for back up and asking Howard additional questions. He asked Howard if the car contained drugs and if he could search the car. Howard's initial answer, that the only illegal item was the gun, added to the trooper's suspicion. Then, Howard consented to Trooper Connors searching his car. The Court finds that Trooper Connor's ten-minute detention of the Defendants, while he investigated the presence of drugs in the car and conducted the traffic stop, was reasonable in both scope and duration.

The Defendants argue that each of the pieces of information or inferences raised by Trooper Connors is a weak indicator, incapable of supporting a reasonable suspicion when considered individually. The Court finds that Trooper Connors acknowledged as much during his testimony, when he agreed that any one of these factors was alone insufficient to provide reasonable suspicion.

However, the Court is required to consider all of the circumstances of the stop in their totality. "[T]he totality of the circumstances test requires courts to recognize that the whole is sometimes greater than the sum of its parts[.]" *Johnson*, 482 F. App'x at 151-52 (Suhrheinrich, J., dissenting); *see also United States v. Arivizu*, 543 U.S. 266, 277 (2002) (observing that "each of these factors alone is susceptible of innocent explanation, and some factors are more probative than others"). For example, the fact that the Defendants had no luggage or extra clothing with them save for a single pair of shorts and a pair of shoes takes on greater significance in light of the information that they traveled eight hours one-way to stay for a single night in a town that they could not name.

The Court also finds that the Defendants were not unreasonably detained during the fourteen-minute period between the time that Defendant Howard consented to the search of the Vue and the drug detection dog's alert. During this time, Trooper Connors obtained Defendant Macias's driver's license and radioed the Defendants' driver's license numbers to the HIDTA Watch Center to learn whether they had any criminal history. Trooper Connors also continued to question Howard about the differences between his and Defendant Macias's accounts of their trip. In response, Howard stated that once they arrived at their hotel, he and Macias texted their location to the girls from North Carolina, so they could meet up, but the girls did not come. This contradicts Howard's statement that he did not know the town or hotel where he had stayed. Also, during this time, Trooper Connors had the Defendants move to Trooper Woods's car, once he arrived, so that the officers could safely search the Vue. Finally, just before the dog sniff, Trooper Connors received the results of the records check from the Watch Center and learned that Macias had a prior felony drug conviction. This information also contributed to Trooper Connors's reasonable suspicion that the Vue contained illegal drugs. *See Johnson*, 482 F. App'x at 146 (observing that a detainee's criminal history is a legitimate factor in analyzing reasonable suspicion).

33

The Defendants argue that none of the questions asked by Trooper Connors related to the alleged traffic violations and that many of the questions were intrusive and wholly extraneous. In this respect, the Court observes that it may find that the officer failed to act diligently when the "'questions unrelated to the traffic violation constituted the bulk of the interaction between the trooper and the [motorist].'" *Everett*, 601 F.3d at 495 (quoting *United States v. Peralez*, 526 F.3d 1115, 1121 (8th Cir. 2008)) (alteration in *Everett*). Here, the Court finds that while some of Trooper Connors's questions were extraneous, the bulk of his questions were calculated to investigate whether the Defendants were engaged in drug crimes. Accordingly, the Court finds that Trooper Connors acted diligently to either confirm or dispel his suspicions of illegal drug possession.

Finally, the Court finds that the arrival of Trooper Rabun and his drug detection dog's sniff of the car did not unreasonably extend the traffic stop. *See United States v. Stepp*, 680 F.3d 651, 663 (6th Cir. 2012) (observing that a dog sniff of a vehicle legally seized does not require separate reasonable suspicion and is analyzed in the same way as extraneous questions). The dog sniff occurred within three minutes of Trooper Connors receiving the information on Defendant Macias's criminal history. Once the drug detection alerted on the car, the officer ostensibly had probable cause to search the car for drugs. "An alert by a properly trained and reliable drug detection dog 'is sufficient to establish probable cause for the presence of a controlled substance.'" *United States v. Stubblefield*, 682 F.3d 502, 507 (6th Cir. 2012) (quoting *United States v. Diaz*, 25 F.3d 392, 394 (6th Cir.1994)). At the evidentiary hearing, the Government did not present any evidence on the reliability and training of this drug detection dog. However, the Court finds that the warrantless search of the Vue did not violate the Fourth Amendment, because Defendant Howard voluntarily consented to a search of the car. Aside from their argument that the search

34

resulted from an unreasonable detention, the Defendants do not contest Defendant Howard's consent or the propriety of the search.

In summary, the Court finds that Trooper Connors had reasonable suspicion to detain the Defendants for the ten minutes leading up to Defendant Howard's consent to search the car and for the additional sixteen minutes until the officers discovered the methamphetamine in the Vue. Moreover the twenty-six minute detention was reasonable in both scope and duration.


### C. Timing of *Miranda* Warnings

The Defendants argue that Trooper Connors violated their Fifth Amendment right against self-incrimination by questioning them at length during the traffic stop, while they were not free to leave and without advising them of the *Miranda* warnings. They maintain that Trooper Connor's questions about incriminating matters, such as drug use and financial means, were designed to elicit incriminating responses and were the functional equivalent of custodial interrogation. Thus, they argue that in the absence of the *Miranda* warnings, their answers to Trooper Connors's questions must be suppressed.

The Fifth Amendment protects against a defendant being "compelled in any criminal case to be a witness against himself." In light of this protection, the Supreme Court has held that law enforcement officers cannot interrogate a suspect who is in custody until they advise the suspect of his or her rights under the Fifth Amendment. *Miranda v. Arizona*, 384 U.S. 436, 478-79 (1966); *see also United States v. Salvo*, 133 F.3d 943, 948 (6th Cir. 1998). "Statements elicited in noncompliance with this rule may not be admitted for certain purposes in a criminal trial." *Stansbury v. California*, 511 U.S. 318, 322 (1994); *Salvo*, 133 F.3d at 948.

Case 3:18-cr-00029-TAV-HBG   Document 35   Filed 10/05/18   Page 35 of 39
PageID #: 894

As stated above, law enforcement officers must advise a person of the *Miranda* warnings, when the person is questioned while in police custody. *Miranda*, 384 U.S. at 478-79; *see also Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam) (holding that the obligation to administer *Miranda* warnings only arises if there has been "such a restriction on a person's freedom as to render him 'in custody'"). In the instant case, Trooper Connors undoubtedly questioned the Defendants to determine whether they were involved in criminal activity, specifically possession of illegal drugs. *See Rhode Island v. Innis*, 446 U.S. 291, 301 (1980) (defining "interrogation" under *Miranda* "express questioning [by the police] or its functional equivalent[,]" which is "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect"). The issue in this case is whether Defendants Howard and Macias were in custody for purposes of the Fifth Amendment at the time Trooper Connors questioned them.

To determine whether an individual is in custody for purposes of receiving the *Miranda* warnings, the Court examines the totality of the circumstances to assess how a reasonable person in that situation would have interpreted the situation. *Stansbury v. California*, 511 U.S. 318, 323 (1994) (holding that the court looks to "the objective circumstances of the interrogation, not on the subjective views" of the questioning officers or the defendant); *Salvo*, 133 F.3d at 948. In other words, would a reasonable individual in the same position as the Defendants have felt free to leave. *United States v. Swanson*, 341 F.3d 524, 529 (6th Cir. 2003). Ultimately, the Court must decide "whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'" *United States v. Knox*, 839 F.2d 285, 291 (6th Cir. 1988) (quoting

*California v. Beheler*, 463 U.S. 1121, 1125 (1983) (internal quotation marks omitted)); *Swanson*, 341 F.3d at 529.

In the instant case, the Defendants certainly did not have unrestrained freedom to move about,[7] nor were they free to leave as they were the subject of both a traffic stop and an investigatory detention or "*Terry* stop" under the Fourth Amendment. Nevertheless, an investigatory detention under the Fourth Amendment does not necessarily equate to custody under the Fifth Amendment. *Knox*, 839 F.2d at 296 (Jones, J., concurring). While acknowledging that a traffic stop curtails the driver's and the passengers' freedom of movement, the Supreme Court has held that an individual briefly detained for a routine traffic stop "is not 'in custody' for the purposes of *Miranda*." *Berkemer v. McCarty*, 468 U.S. 420, 437, 440 (1984). In so holding, the Court likened a traffic stop to a "*Terry* stop" and observed that "[t]he comparatively nonthreatening character of detentions of this sort explains the absence of any suggestion in our opinions that *Terry* stops are subject to the dictates of *Miranda*." *Id.* at 440; *see also Knox*, 839

---

[7] Our appellate court has set forth several factors useful in determining whether an individual is in custody:

> (1) the purpose of the questioning; (2) whether the place of the questioning was hostile or coercive; (3) the length of the questioning; and (4) other indicia of custody such as whether the suspect was informed at the time that the questioning was voluntary or that the suspect was free to leave or to request the officers to do so; whether the suspect possessed unrestrained freedom of movement during questioning; and whether the suspect initiated contact with the police or voluntarily admitted the officers to the residence and acquiesced to their requests to answer some questions.

*Salvo*, 133 F.3d at 950; *see also Swanson*, 341 F.3d at 529.

F.2d at 292 & 296 (Jones, J., concurring) (rejecting the proposition that an investigatory detention can never evolve into custodial interrogation).

Consideration of all the circumstances surrounding the instant Defendants' twenty-six-minute detention, prior to the discovery of the drugs in the Vue, persuades the Court that they were not in custody and the *Miranda* warnings were not required. First, the Court finds that the location of questioning was not hostile or coercive. Defendant Howard was questioned while standing on the side of the road beside Trooper Connor's patrol car. Although Defendant Howard was invited to sit in Trooper Connors's patrol car where it was warm, he declined to do so and was permitted to stand outside. Defendant Macias was questioned while he sat in the Vue. Moreover, the circumstances of the questioning were not intimidating or coercive. Trooper Connors tone was genial. Neither Defendant was handcuffed. Although the Defendants could not leave while Trooper Connors conducted the traffic stop and investigated his suspicions of drug possession, their detention was certainly not "of the degree associated with a formal arrest." *See Knox*, 839 F.2d at 291. Accordingly, the Court finds that the *Miranda* warnings were not required during the Defendants' investigatory detention.

V.    **CONCLUSION**

After carefully considering the parties' filings and arguments, the evidence, and the relevant legal authorities, the Court finds no Fourth Amendment violation occurred in this case, because the trooper had probable cause to stop the Defendants' car for two traffic violations and reasonable suspicion to detain the Defendants, until the drugs were found in the car. The Court also finds that the twenty-six-minute detention of the Defendants was reasonable in both duration

38

and scope. Finally, the Court finds that the Defendants were not entitled to the *Miranda* warnings during their detention. Accordingly, the undersigned respectfully **RECOMMENDS** that the Defendants' Joint Motion to Suppress [**Doc. 22**] be denied.[8]

Respectfully submitted,

United States Magistrate Judge

---

[8] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2) (as amended). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); *see United States v. Branch*, 537 F.3d 582, 587 (6th. Cir. 2008); *see also Thomas v. Arn*, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the required time period waives the right to appeal the District Court's order). The District Court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive, or general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).