UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:18-CR-29-TAV-HBG |
| | ) | |
| LEESHAWN HOWARD and | ) | |
| JONATHAN MACIAS, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION & ORDER**

This criminal matter is before the Court for consideration of the Report and Recommendation entered by United States Magistrate Judge H. Bruce Guyton ("R&R") [Doc. 35]. The R&R addresses defendants' Joint Motion to Suppress, in which defendants seek an order suppressing all statements and evidence, including firearms, ammunition, and drugs, obtained in the course of a traffic stop on January 15, 2018 [Doc. 22]. Magistrate Judge Guyton held a hearing on the motion on July 26, 2018 [Doc. 28]. Both defendants and the government filed post-hearing briefs, as permitted by the Court [Docs. 33, 34]. Magistrate Judge Guyton then issued the R&R, recommending that the Court deny defendants' motion [Doc. 35 p. 39]. Defendants filed objections to the R&R [Doc. 37], to which the government briefly responded [Doc. 38]. For the reasons that follow, the Court will overrule defendants' objections, accept the R&R, and deny defendants' motion to suppress.

**I.     Background**

Defendants are charged with conspiring to distribute methamphetamine and with possession of a firearm in furtherance of a drug trafficking crime [Doc. 1]. Defendant Macias is also charged with being a felon in possession of a firearm [*Id.*]. The Court presumes familiarity with the facts and R&R in this case, but for purposes of background, includes the following findings of fact as articulated in the R&R and based upon the testimony and exhibits introduced at the suppression hearing:[1]

> On the morning of January 15, 2018, Trooper William Connors of the Tennessee Highway Patrol was on duty and parked in the median, perpendicular to the eastbound lanes of I-40. While waiting for a break in traffic so that he could enter the roadway, he saw a green Saturn Vue come over a hill in the middle lane. The Vue touched, but did not cross, the line dividing the middle and left lanes, then moved into the right lane, behind a tractor trailer, which was traveling at fifty-five miles per hour. Trooper Connors thought that the Vue's move into the right lane behind the tractor trailer, just after the driver of the Vue could see him, was suspicious and could indicate that the Vue was transporting illegal drugs. The Vue passed Trooper Connors's patrol car as Trooper Connors pulled from the median into the left lane of I-40. At that time, which was 10:08:14 on the video recording, the Vue was traveling at sixty-five miles per hour and was three seconds behind the tractor trailer. As the Vue continued in the right lane, it drew progressively closer to the tractor trailer. Trooper Connors saw the Vue cross the line dividing the lanes twice. Trooper Connors moved into the middle lane at 10:09:00 on the video recording, and the Vue braked six seconds later. Trooper Connors moved into the right lane behind the Vue at 10:09:19 on the video recording. Five seconds later, Trooper Connors activated his blue lights and stopped the Vue for two traffic violations, failure to maintain a lane and traveling too closely to the tractor trailer. The Vue immediately pulled over without incident. Trooper Connors radioed for a check on the Vue's North Carolina license plate.

---

[1]     The Court notes that defendants object to certain portion of the R&R's findings of fact, including the characterization and consideration of certain facts. The Court will address those objections in its analysis.

2

As Trooper Connors approached the Vue from his patrol car, he noticed that it contained two male occupants and that the passenger was awake and talking to the driver but remained reclined in his seat. He also noticed that the car did not contain luggage. The driver Leeshawn Howard opened the driver's side door just as Trooper Connors walked up. Trooper Connors stood inside the driver's side door, shielded from the passing traffic, and requested a driver's license, registration, and insurance card from Howard. At that time, Trooper Connors noticed that both men had facial tattoos on their left cheeks and that Howard was breathing heavily and his hands were shaking. Trooper Connors stated that Howard was more nervous than the average motorist. Howard gave Trooper Connors his driver's license. When Howard opened the glovebox to get the registration, Trooper Connors saw a gun in the glovebox. Howard immediately told Trooper Connors that the gun was his. While Trooper Connors talked with Howard, the passenger stared forward and did not look at the officer. Howard gave Trooper Connors the car's registration but not the proof of insurance. Trooper Connors asked Howard to step out of the car and back to his patrol car. Trooper Connors then walked to the passenger side of the Vue, asked the passenger to place his hands on the center console, retrieved the gun from the glovebox, and placed it on the roof of the Vue.

Trooper Connors joined Howard at the front passenger side of his patrol car and, while recording information on Howard's driver's license and insurance, Trooper Connors questioned him about his itinerary and his passenger. Howard told Trooper Connors that they had traveled eight hours from Raleigh, North Carolina, to the mountains for vacation and that they were supposed to meet some girls, who were traveling separately from North Carolina. However, Howard said the girls never showed up, and after spending one night, he was returning to North Carolina. Howard did not know the name of the city or the hotel where they had stayed. He told Trooper Connors that his passenger, Jonathan Macias, was his cousin but then agreed that he was actually a friend, rather than a relative. Pursuant to questions by Trooper Connors, Howard stated that he was not on probation or parole, that he had never been arrested, and that he was unemployed.

Trooper Connors returned to the passenger side of the Vue and asked Macias to identify himself. He then asked Macias to look through the papers in the glovebox for proof of insurance. Trooper Connors said Macias also seemed overly nervous and withdrawn. Pursuant to questions from Trooper Connors, Macias said he was not on probation or parole and that he had been arrested for petty crimes. Trooper Connors questioned Macias about his and Howard's itinerary. Macias first said they had gone to visit family and then said they had partied with some girls from Tennessee. Macias also could not

3

identify the town or the hotel where he and Howard had stayed. Macias was not able to locate the proof of insurance in the glove box. While standing beside the Vue, Trooper Connors radioed in the serial number from the gun and called for back up.

As he awaited the results from the records checks, Trooper Connors returned to talk with Howard and asked him whether the Vue contained anything illegal. Howard responded nothing except for the gun. When Trooper Connors said that it is not illegal to have a gun, Howard said that he did not know of anything illegal in the car. Trooper Connors asked if there were drugs in the car, and Howard denied that any drugs were in the car. Trooper Connors asked Howard if he could search the car, and Howard said he could if he wanted. Trooper Connors asked Howard if he had anything illegal on his person and if he could search Howard. Howard denied having anything illegal but agreed to be frisked. While searching Howard, Trooper Connors questioned Howard again about their trip. Howard confirmed that the two men did not meet up with girls during their travels and stated that they went to Waffle House. Ten minutes had elapsed from the time Trooper Connors stopped the Vue to the time that Howard gave consent to search the car.

Trooper Connors walked back to the Vue and got Macias's drivers license. Trooper Connors then returned to his patrol car, where he radioed Howard and Macias's driver's license numbers to the HIDTA Watch Center to check whether Howard or Macias had a criminal history. While entering information into his in-car computer, Trooper Connors continued questioning Howard about his smoking habits, the lack of luggage in the car, his children, his employment history, and how he afforded the trip. Trooper Connors confirmed that Howard did not know the town in which he had stayed. Howard related that once they arrived at where they were staying, they texted their location to the girls who were to meet them. Pursuant to questions by Trooper Connors, Howard said nothing was hidden in the car.

Trooper Woods arrived twenty minutes after the initial stop, and Trooper Connors briefed him on the situation. Trooper Connors asked Howard to sit in Trooper Woods's patrol car during the search of the Vue. Trooper Connors returned to the Vue, asked Macias to get out, and frisked him. Trooper Connors then directed Macias to sit in Trooper Woods's patrol car. The Watch Center informed Trooper Connors that Macias had a prior felony drug conviction. Trooper Rabun, who arrived on the scene after Trooper Woods, led his drug detection dog around the Vue, and the dog alerted on the front passenger side. The dog sniff occurred approximately twenty-four minutes after the initial stop. Within two minutes of the dog

4

sniff, Troopers Woods and Connors searched the Vue and found two packages of methamphetamine under the driver's and front passenger seats. They also found a second handgun in the center console. After searching the car, Trooper Connors returned to Trooper Woods's patrol car and read the *Miranda* warnings to Howard and Macias from a card. Both men stated that they understood the warnings. About ten minutes after Trooper Connors read the *Miranda* warnings, Macias gave a statement, claiming ownership of the drugs and the gun from the console.

## II. Standard of Review

A court must conduct a *de novo* review of those portions of a magistrate judge's report and recommendation to which a party objects unless the objections are frivolous, conclusive, or general. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3); *Smith v. Detroit Fed'n of Teachers, Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987); *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). "Objections disputing the correctness of the magistrate's recommendation, but failing to specify the findings believed to be in error are too general and therefore insufficient." *Stamtec, Inc. v. Anson*, 296 F. App'x 516, 519 (6th Cir. 2008) (citing *Spencer v. Bouchard*, 449 F.3d 721, 725 (6th Cir. 2006)). The Court "may accept, reject, or modify, in whole or in part, the findings or recommendations" made by the magistrate judge. 28 U.S.C. § 636(b)(1).

## III. Analysis

Defendants' objections largely restate the original arguments set forth in their joint motion to suppress. First, defendants argue that Magistrate Judge Guyton incorrectly determined that Trooper Connors had probable cause to stop defendants' vehicle [Doc. 37 pp. 5–12]. Next, defendants assert that, even if probable cause existed to justify the initial stop, defendants were detained longer than reasonably necessary because Trooper Connors

5

Case 3:18-cr-00029-TAV-HBG Document 41 Filed 11/20/18 Page 5 of 20 PageID #: 940

lacked reasonable suspicion to extend the stop [*Id*. pp. 12–22]. Finally, defendants object to Magistrate Judge Guyton's finding that no *Miranda* warnings were required prior to questioning by Trooper Connors because defendants were not in "custody" for purposes of the *Miranda* inquiry [*Id.* pp. 23–24]. As such, defendants object to the R&R's recommendation that the evidence seized during the stop should not be suppressed.

### A. Probable Cause for Traffic Stop

Magistrate Judge Guyton found that Trooper Connors had probable cause to believe that the driver of defendants' vehicle—defendant Howard—had committed two traffic violations: (1) failure to maintain a single lane as nearly as practical in violation of Tenn. Code Ann. § 55-8-123(1), and (2) following too closely in violation of Tenn. Code Ann. § 55-8-124(a) [Doc. 35 p. 24]. Accordingly, Magistrate Judge Guyton determined that Trooper Connors lawfully stopped defendants' vehicle. Defendants object to the legal conclusions and factual determinations underpinning this conclusion [Doc. 37 p. 5]. Primarily, defendants insist that defendant Howard did not commit the traffic offenses alleged, and that the R&R erred in crediting Trooper Connors's testimony to the contrary and in finding that the video from his patrol car substantiated a traffic violation [*Id*. pp. 5–6].

At the outset, it is worth clarifying the standard for determining the legality of a traffic stop. Defendants spend a significant portion of their post-hearing brief and joint objection to the R&R arguing that defendant Howard did not improperly fail to maintain his lane, nor did he follow the truck in front of him more closely than was reasonable and

6

prudent based on traffic conditions at the time. However, the inquiry for purposes of determining the existence of probable cause does not require that the Court affirmatively find that defendants violated a traffic law. Instead, the question of legality under the Fourth Amendment is whether, based on "an objective assessment of an officer's actions in light of the facts and circumstances then known to him . . . . the officer has probable cause to *believe* that a traffic violation has occurred or was occurring." *United States v. Ferguson*, 8 F.3d 385, 388–391 (6th Cir. 1993), *cert. denied*, 513 U.S. 828 (1994) (emphasis added). The Sixth Circuit has repeatedly confirmed this bedrock distinction, noting in one case that probable cause "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *United States v. Barrett*, 890 F.2d 855, 861 (6th Cir. 1989) (citing *Illinois v. Gates*, 462 U.S. 213, 244 n. 12 (1983)). *See also United States v. Ferguson*, 8 F.3d 385, 392 (6th Cir. 1993) ("Probable cause is defined as 'reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion.'").

Trooper Connors had probable cause to stop defendants' vehicle. Beginning with the first alleged traffic violation, Tenn. Code Ann. § 55-8-123(1) provides that whenever a road has been divided into two or more lanes, "[a] vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from that lane until the driver has first ascertained that the movement can be made with safety[.]" Here, Trooper Connors testified at the suppression hearing that he observed defendants' vehicle cross the line dividing the lanes twice prior to the traffic stop [Doc. 29 p. 11]. This testimony is

7

consistent with the narrative included in Trooper Connors's incident report from that stop [Exh. 5]. Somewhat confusingly, defendants state in their post-hearing brief that they "do not challenge the credibility of the trooper," [Doc. 34 p. 9] but later allege that his testimony was "deficient and unreliable" and object to the R&R's "strong reliance" on it in finding probable cause [Doc. 37 pp. 5–7].

The Court has also independently reviewed the video recording from Trooper Connors's patrol car, and it does not undermine Magistrate Judge Guyton's factual findings. Magistrate Judge Guyton's factual finding, that "it appears the Vue crosses over the line dividing the right lane from the emergency lane at 10:08:56-57 in the video recording" [Doc. 35 p. 25], appears to be correct. At the very least, the video shows defendants' car driving on or very close to the lane line, on the far-right side, for several seconds. And although the video is valuable evidence, it is not sacrosanct: as Trooper Connors correctly noted at the hearing, the video quality is not entirely clear. For example, although defendants attack the credibility of Trooper Connors because he could not identify exactly when defendants' car crossed the line, this is entirely unsurprising given the blurriness of the painted traffic-lane lines. This makes it impossible to confirm or reject Trooper Connors's testimony that he observed defendants' car crossing over the line. Moreover, Trooper Connors credibly testified that he could see more clearly that day than the video depicts [Doc. 29 p. 104]. Thus, there were reasonable grounds for the trooper's belief that the driver committed a traffic violation.

As defendants and Magistrate Judge Guyton correctly point out, the Sixth Circuit has held that a single instance of crossing the lane line does not amount to a violation of § 55-8-123(1). *United States v. Freeman*, 209 F.3d 464, 466 (6th Cir. 2000). But that rule is inapposite here because the defendants' vehicle crossed outside of the right lane *twice* [Doc. 35 p. 25], as the trooper testified and Magistrate Judge Guyton correctly found. Defendant's objection based on *Freeman* is therefore without merit [Doc. 37 p. 7]. And even if defendants' car did only cross the lane line once, Trooper Connors still had an independent, sufficient basis to stop defendants for following too closely, in violation of § 55-8-124(a), which will be explained later.

Defendants further argue, based on *State v. Binette*, 33 S.W.3d 215 (Tenn. 2000), that the R&R should have considered whether defendants' vehicle was "driven as nearly as practicable" within the right lane, as is required under § 55-8-123(1) [Doc. 37 pp. 7–8]. Based on the traffic and weather conditions on the road as depicted in the video, there does not appear to be a good reason why defendant Howard would have had trouble keeping his car within the lane: traffic was not heavy, the wind appears light, and this particular stretch of I-40 is straight and flat. Thus *Binette*, where the court found that the defendant's driving was not erratic or improper where the road was "winding" and "difficult," 33 S.W.3d at 219, is distinguishable, and defendants' reliance on it is misplaced.

There was also probable cause to believe that defendant was following too closely, in violation of Tenn. Code Ann. § 55-8-124(a), which provides that "[t]he driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent,

9

having due regard for the speed of the vehicles and the traffic upon and the condition of the highway." As Magistrate Judge Guyton stated:

> In this case, Trooper Connors testified that he observed the Vue, which was traveling at sixty-five miles per hour, pull into the right lane behind a tractor trailer, which was traveling at fifty-five miles per hour. Trooper Connors stated that under normal weather and traffic conditions, he deemed a distance between vehicles that would allow three seconds to elapse between the first vehicle and the second passing a fixed point to be safe. He said that although the Vue was three seconds behind the tractor trailer at the time the Vue passed his location in the median, it progressively gained on the tractor trailer, until it was traveling only one second behind it. Trooper Connors also testified that he deemed the distance between the Vue and the tractor trailer to be too close and that at one point the driver of the Vue had to apply his brakes in order to avoid the tractor trailer. The Court finds that the video recording [Exh. 1] from Trooper Connors's patrol car corroborates his testimony. Accordingly, the Court finds that Trooper Connors had probable cause to believe that Defendant Howard was following the tractor trailer too closely in violation of § 55-8-124(a).

[Doc. 35 pp. 26–27]. Defendants object "to the Report's finding that Mr. Howard violated a state traffic law by following too closely," and assert that the R&R "erred by simply crediting the trooper's testimony as corroborating evidence for the video recording without sufficiently considering whether Mr. Howard acted as a reasonable and prudent driver" [Doc. 37 p. 9].

Defendants mischaracterize Magistrate Judge Guyton's findings. It does not matter whether, as defendants argue, Mr. Howard in fact did violate a state traffic law by following too closely. Rather, as the law requires and as Magistrate Judge Guyton correctly found, "Trooper Connors had *probable cause to believe* that Defendant Howard was following the tractor trailer too closely" [Doc. 35 p. 27]. Trooper Connors testified that, based on his experience and considering the conditions on the road at the time, he

10

believed defendants' car was following the tractor trailer too closely [Doc. 29 p. 13]. The video similarly shows that, rather than passing the slower-moving tractor trailer as two other cars do, defendant Howard closely follows the truck and at one point had to brake as a result. Defendants attempt to argue that defendant Howard acted reasonably in braking to avoid causing an accident, but this argument ignores the fact that defendant Howard created the conditions that required him to brake in the first place. Defendants' argument that defendant Howard acted reasonably in moving out of the trooper's way is similarly specious, considering the fact that defendant Howard could have passed the tractor trailer in the center lane while leaving Trooper Connors's far-left lane clear.

Because Trooper Connors had probable cause to believe defendants' car violated at least two traffic laws, defendants were properly seized under the Fourth Amendment. *See Whren v. United States*, 517 U.S. 806, 810 (1996) (holding that "[a]s a general matter, the decision to stop an automobile is reasonable [within the meaning of the Fourth Amendment] where the police have probable cause to believe that a traffic violation has occurred"); *United States v. Townsend*, 305 F.3d 537, 541 (6th Cir. 2002) (holding that "[a] police officer may effect a traffic stop of any motorist for any traffic infraction, even if the officer's true motive is to detect more extensive criminal conduct"). As such, the stop itself does not provide a basis for suppressing the evidence subsequently seized.

### B. Scope and Duration of Traffic Stop

Defendants next argue that, even if probable cause existed for the traffic stop initially, defendants' subsequent detention was unlawful [Doc. 37 p. 12]. Magistrate Judge

11

Guyton concluded that defendants' detention did not violate the Fourth Amendment because Trooper Connors had reasonable suspicion to detain defendants and the detention as a whole was reasonable in both scope and duration [Doc. 35 pp. 28–35]. Defendants object to this conclusion and assert that the R&R improperly relied too heavily on the trooper's subjective beliefs while failing to evaluate his actions objectively [Doc. 37 pp. 14–16]. Defendants further assert that the R&R failed to fully consider the nature and extent of the trooper's questioning and the context in which defendants answered those questions [*Id.* pp. 17–18].

As stated in the R&R, "[A] search which is reasonable at its inception may violate the Fourth Amendment by virtue of its intolerable intensity and scope." *Terry v. Ohio*, 392 U.S. 1, 18 (1968). To justify further detention, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* at 21. *See also United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999) ("Once the purpose of the traffic stop is completed, a motorist cannot be further detained unless something that occurred during the stop caused the officer to have a reasonable, articulable suspicion that criminal activity was afoot."). In evaluating the reasonableness of the stop, the Court must look objectively at the totality of the circumstances surrounding the stop. *Terry*, 392 U.S. at 21–22; *United States v. Everett*, 601 F.3d 484, 494 (6th Cir. 2010).

"In assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently

12

Case 3:18-cr-00029-TAV-HBG Document 41 Filed 11/20/18 Page 12 of 20
PageID #: 947

pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *United States v. Sharpe*, 470 U.S. 675, 687 (1985) (assessing the reasonableness of a *Terry* stop); *Everett*, 601 F.3d at 494 (describing officer diligence as "the overarching consideration" in assessing the reasonableness of a *Terry* stop). "Context-framing questions" involving, for example, "the motorist's travel history and plans and the driver's authority to operate the vehicle . . . . will rarely suggest a lack of diligence." *Everett*, 601 F.3d at 494 (internal quotations omitted).

Magistrate Judge Guyton correctly concluded that the detention here was not unreasonable in scope or duration. Although Trooper Connors had independent probable cause to stop defendants' vehicle for traffic violations, his suspicions of criminal activity arose before that. Trooper Connors testified that, given his law enforcement experience, he found it suspicious that defendant Howard was looking at him out of the corner of his eye as he passed and moved into the far-right lane behind the slower-moving tractor trailer, rather than passing it [Doc. 29 pp. 10–11]. In his opinion, this indicated that defendant Howard was trying to avoid his attention by moving as far away from him as he could. And, as explained above, defendant Howard's decision not to pass the tractor trailer was objectively unusual. Particularly in light of Trooper Connors's training in drug interdiction [*see id*. p. 7–8], it is reasonable that a trained law enforcement officer would notice defendant Howard's driving behavior and attach some significance to it.

13

Defendants also object to the R&R's alleged over-reliance on "the trooper's subjective beliefs without sufficiently evaluating whether his actions were objectively reasonable" [Doc. 37 p. 14]. The Court disagrees with this assessment. Magistrate Judge Guyton properly noted that Trooper Connors had over ten years of law enforcement experience, and evaluated the trooper's opinion in this light [*see* Doc. 35 p. 30]. Although Trooper Connors's own view is, of course, subjective, it must be evaluated objectively in light of his training and other conditions on the road at the time of the stop. The Supreme Court, in discussing the objective and "whole picture" nature of the reasonable-suspicion inquiry, has noted that "a trained officer draws inferences and makes deductions—inferences and deductions that might well elude an untrained person." *United States v. Cortez*, 449 U.S. 411, 418 (1981). Thus, an officer's observations and the evidence he collects "must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." *Id.*

Viewed in this light, Trooper Connors had reasonable suspicion, supported by specific and articulable facts, to justify defendants' detention after the traffic stop. In addition to the indicators identified by Trooper Connors before the stop, he noted several others that unfolded during the stop. He testified that defendants' vehicle had a North Carolina license plate, and yet the car contained no luggage [Doc. 29 pp. 22–23]. The passenger, defendant Macias, remained reclined in his seat rather than sitting up when Trooper Connors approached the vehicle, and he looked straight ahead throughout the exchange, all of which Trooper Connors noted was unusual [*Id.* pp. 21–22]. Defendant

14

Case 3:18-cr-00029-TAV-HBG    Document 41    Filed 11/20/18    Page 14 of 20
PageID #: 949

Howard appeared to be more nervous than the average motorist in a traffic stop, as Trooper Connors noticed that he was breathing heavily and his hands were shaking [*Id.* p. 88]. When defendant Howard reached into the glove box to retrieve his license and registration, Trooper Connors noticed a handgun inside, which defendant Howard claimed as his [*Id.* p. 22].

Trooper Connors himself stated that, while each of these facts on its own might not raise any particular suspicion, they do when considered together [*Id.* p. 23]. Defendants' objection to the R&R is replete with arguments that certain pieces of evidence considered by the R&R could have an innocent explanation [*see* Doc. 37 pp. 15–18]. However, "[r]easonable suspicion is based on the totality of the circumstances," *Joshua v. DeWitt*, 341 F.3d 430, 443 (6th Cir. 2003), and Trooper Connors and Magistrate Judge Guyton properly evaluated this evidence as such.

As Trooper Connors began to question defendants about their travel history and plans in an effort to confirm or dispel his mounting suspicions, defendants' answers only aroused his suspicions further. First, defendant Howard stated that they had driven eight hours from Raleigh, North Carolina to Tennessee for vacation, but could not name the city or hotel where they had stayed [Doc. 29 pp. 31–32]. Defendants argue that such a response would be "predictable" from someone from out of state [Doc. 37 p. 15], but the Court disagrees. Common sense indicates that traveling by car from out of state often requires advanced planning to avoid getting lost or otherwise delaying travels in an unfamiliar area. Defendant Howard also stated that defendants had planned on meeting others at their

15

destination in Tennessee and were going to text them their address when they arrived—something that would have required defendants to know where they were staying [*see* Doc. 29 p. 30].

Furthermore, when Trooper Connors asked defendant Macias similar questions, Macias also could not identify the town or hotel where they had stayed and gave conflicting answers compared to Howard's version of the trip. For example, while Howard stated that the individuals they were supposed to meet never showed up, Macias said they had "met up with the girls" and had "partied all night" [*Id.* p. 37]. Both defendants were also individually inconsistent in their answers to questioning about prior arrests. Such inconsistencies naturally indicate deceptive behavior, and add to the facts supporting reasonable suspicion of criminal activity.

Defendants also argue that the R&R "did not sufficiently consider the context or environment" in which defendants answered the trooper's questions [Doc. 37 p. 18], and "overemphasized the nervousness of the Defendants as an indicator of criminal activity" [*Id.* p. 19]. In particular, defendants argue that Trooper Connors created an environment "in which any driver would be extremely nervous," and that this explains defendants' answers to the trooper's questions [*Id.* p. 19]. Defendants are correct that the Sixth Circuit has deemed nervousness to be a relatively weak indicator of criminal activity. *See, e.g., DeWitt*, 341 F.3d at 445. However, rather than overemphasizing this fact, as defendants suggest, Magistrate Judge Guyton specifically recognized nervousness as a weak indicator which, *combined with other weak and stronger indicators*, created reasonable suspicion

16

[Doc. 35 pp. 31–32]. This analysis was proper under a totality-of-the-circumstances inquiry.

Finally, defendants' argument that the R&R failed "to consider the cumulative effect" of Trooper Connors's "excessive" and "extraneous" questioning at the scene [Doc. 37 p. 17, 21], is similarly unavailing. Magistrate Judge Guyton painstakingly reviewed the quantity and quality of Trooper Connors's questioning, the length of time each line of questioning took, and the actions Trooper Connors took to further confirm or deny the information defendants provided, such as calling in for a records check on the gun and defendants' criminal record [*see* Doc. 35, pp. 31–34]. Judge Guyton acknowledged that "while some of Trooper Connors's questions were extraneous, the bulk of his questions were calculated to investigate whether the Defendants were engaged in drug crimes" [*Id.* p. 34]. After all of this, Judge Guyton concluded that Trooper Connors "acted quickly to either confirm or dispel his suspicions" of criminal activity, and that "the twenty-six minute detention was reasonable in both scope and duration" [*Id.* pp. 34–35]. This is precisely what is required under Supreme Court and Sixth Circuit precedent, and so Magistrate Judge Guyton correctly concluded that Trooper Connors had the reasonable suspicion necessary to justify defendants' detention.

### C. Timing of *Miranda* Warnings

Finally, defendants specifically object to the R&R's finding that "the circumstances at the scene [of the traffic stop] were not custodial in nature," and accordingly, the R&R's determination that Trooper Connors was not required to issue *Miranda* warnings before

17

questioning defendants [Doc. 37 p. 23]. Defendants maintain that the traffic stop—which defendants note involved "many investigatory questions" by an armed officer in uniform, geared toward uncovering drug activity—"represent the 'functional equivalent' of 'express questioning' about criminal activity" [*Id.*].

As Magistrate Judge Guyton noted, "the Supreme Court has held that law enforcement officers cannot interrogate a suspect who is in custody until they advise the suspect of his or her rights under the Fifth Amendment. *Miranda v. Arizona*, 384 U.S. 436, 478-79 (1966); *see also United States v. Salvo*, 133 F.3d 943, 948 (6th Cir. 1998)." [Doc. 35 p. 35]. Magistrate Judge Guyton agreed with defendants regarding the "interrogation" requirement, finding that "Trooper Connors undoubtedly questioned the Defendants to determine whether they were involved in criminal activity" [*Id.* p. 36]. However, Magistrate Judge Guyton determined that, based on the totality of the objective circumstances, defendants were not in "custody" during the trooper's questioning, and as such that *Miranda* warnings were not required [*Id.* p. 38]. This determination was based primarily on the fact that the location and circumstances of the questioning were not hostile, intimidating, or coercive [*Id.*]. In particular, defendants were given options with regard to where the questioning took place, they were not handcuffed, and the tone of the questioning was genial, all pointing to a detention that was "not of the degree associated with a formal arrest" [*Id.*].

That was correct. While Trooper Connors was questioning defendants, defendants were, for the most part, either sitting in their own car or standing on the side of the road.

18

Trooper Connors invited defendant Howard to sit in his patrol car given the cold temperature outside, but permitted him to stand outside when Howard declined the invitation [*see* Doc. 29 p. 25].  This choice, combined with the fact that defendants were not handcuffed, demonstrates that although defendants were not free to leave, their movements were not as restrained as would be characteristic of a formal arrest.  *See United States v. Knox*, 839 F.2d 285, 291 (6th Cir. 1988) (citing *California v. Beheler*, 463 U.S. 1121, 1125 (1983)).  The questioning also took place over the course of twenty-six minutes on the side of a busy highway—hardly the kind of private, lengthy interrogation that the Supreme Court was concerned about in *Miranda*.  *See* 384 U.S. at 448–49.  Furthermore, the trooper's tone was friendly and pleasant, and his questioning inquisitive, rather than coercive, hostile, or accusatory.

Defendants point to the fact that the trooper "arrived in a marked patrol car with blue flashing lights," and "was wearing a uniform and displaying a firearm on his hip" as evidence of a custodial interaction between Trooper Connors and defendants [Doc. 37 p. 23].  However, these facts are characteristic of almost all traffic stops, and of course, not all traffic stops require issuance of a *Miranda* warning.  In fact, the Supreme Court has noted the stark difference in circumstances between those of a traffic stop and those often present in a stationhouse interrogation.  *See Berkemer v. McCarty*, 468 U.S. 420, 437–39 (1984). In *Berkemer*, the Court found that although "a traffic stop significantly curtails the 'freedom of action' of the driver and the passengers," the comparatively brief and public

19

questioning involved in a traffic stop reduces the danger of coerced self-incrimination that *Miranda* was designed to address. *Id.*

Accordingly, defendants were not in custody, and *Miranda* warnings were not required prior to the discovery of drugs in the car.

**IV.    Conclusion**

For the reasons stated above, defendants' objections [Doc. 37] are **OVERRULED**. The Court **ACCEPTS in whole** the R&R [Doc. 35] and incorporates it into this Memorandum Opinion and Order.  Accordingly, defendants' Joint Motion to Suppress [Doc. 22] is **DENIED**.

IT IS SO ORDERED.

s/ Thomas A. Varlan<br>
CHIEF UNITED STATES DISTRICT JUDGE